090191 Robert Deepen v. Connell Benson. Counsel, you may proceed. Good morning, Your Honor. Good morning, Counsel. My name is Timothy Cantland and I represent the petitioner-slash-appellant in this matter. The arbitrator awarded benefits to the petitioner under the Act, and the Commission subsequently reversed the arbitrator's decision and the Circuit Court affirmed. It's petitioner's contention that the Commission's decision is faulty and against the manifest way of the evidence for two reasons. The first reason is the Commission's decision to overturn the arbitrator's findings is not based on any contrary evidence, and two, the Commission is fixated on this unsupported proposition that medical records must contain a patient's work history before they can be considered credible. When looking at the Commission's decision in opinion on review, the sole justification for the Commission's decision is that the evidence was without support in the contemporaneous medical history. The Commission's adoption of this phrase, not supported in the contemporaneous medical history, cannot be the sole basis for the Commission overturning the arbitrator's finding. So, as such, the manifest way of the evidence shows that the petitioner provided notice that was sufficient, July 15, 2000 was a date which the petitioner's injury manifested itself, and three, the medical records along with the medical testimony proves that the petitioner's condition of ill being is causally related to his employment. I first want to address what evidence was presented at the trial and then I'll address why the Commission's adoption of the phrase not supported in the contemporaneous medical history is not enough to overturn the arbitrator's decision. This Court is well aware of the standards for the Commission and that there must be sufficient factual evidence in the record to support the Commission's decision. That's the problem with the Commission's decision in this case, is that there is no factual evidence presented that allows the Commission to give, to overturn the arbitrator's decision. Let's look at the evidence that was presented in the case. First, let's look at the petitioner's job activities. The petitioner provided detailed, undisputed testimony describing his job activities. And the Commission recognized this. And they acknowledged what the petitioner said. And they even, and I quote the Commission, that giving some mechanism of injury that can be acceptable in repetitive trauma cases. The respondent provided no contrary evidence of petitioner's job activities. Secondly, let's look at the evidence regarding notice. The petitioner... Before I get into the notice, you indicated that, and, you know, had a superficial appeal to it. Well, the Commission just shouldn't reject the testimony of Dvorsky because there's no legitimate basis to do so. At least that's your argument. However, what about Dr. Vendor's opinion? Isn't there clearly contrary evidence in the record? Vendor says claimant's condition of ill-being was caused by a cyst and degenerative arthritis, correct? Dr. Vendor's opinion is very suspect in that, first, in his deposition, he testifies that with the job act, if he knew of physical activities that the petitioner did, his condition of ill-being could be causally related to a repetitive trauma injury in his deposition. But further note, the Commission, nowhere in their decision says that. That's not the Commission. The Commission nowhere relies on Dr. Vendor's opinion. The Commission merely states that Dr. Dvorsky's deposition is suspect because it's so long after his opinion. Right. But I was only bringing up the point. You seem to start off by indicating, well, you know, you have Dvorsky and the Commission ignored this testimony and that's it. There's nothing to contradict that. However, you admit, at least arguably, Vendor's opinion is not consistent and contradicts Dvorsky. Would you concede that much? I don't believe Dr. Vendor's medical opinion is very relevant in this case because he testifies under oath in his evidence deposition that with physical activities, the petitioner's repetitive trauma injury could have happened. And he testifies in there because there was nothing in the medical records. He didn't have and he didn't know what his day-to-day basic activities were. Well, you're doing the same thing that you're doing in attacking the Commission's view of Dvorsky. You're saying that the Commission's analysis of Dvorsky is flawed. And now you're saying that Vendor's opinion is somewhat suspect, correct? Dr. Dvorsky, there's a big difference between Dr. Dvorsky and Dr. Vendor. Dr. Vendor is a hired expert by the defendants. Dr. Dvorsky is a treating physician. And so where does it say the Commission has to believe the treating physician over the hired gun? Where does the law say that? It doesn't say that anywhere that I'm aware of. But when we're looking at the treating physician, in the Commission's, the Commission basically has about three paragraphs in which they focus on their analysis and reasoning. And they highly discredit Dr. Dvorsky because his opinion so long after, without contemporarily noted history, is suspect and would appear without, would appear as speculation at that point. And they go on further down that it's based on speculation. They're highly discounted. But either they weren't made aware of or they forgot somewhere along the line. But in Dr. Dvorsky's evidence deposition in which he testified under oath that he was aware of the petitioner's work in his basic activities that he did at work, and then uses his medical treatment of him, and then causally, oh, excuse me, he creates a condition of ill being and causally relates it to his employment. So you're saying as a treating physician his opinion is much more complete, it should be more persuasive, there's a lot of things going for Dvorsky that arguably Vendor doesn't have. And the answer would be still, as you know, the law, that's within the province of the commission, isn't it? Yeah, it is under the commission's authority to put weight to what they feel. But there is in Dr. Vendor's deposition, he states because there's nothing in the medical history, he does, you know, if you've given him repetitive trauma or repetitive motions, which the petitioner specifically gave undisputed testimony about, then he would say there was a repetitive trauma. All right. I think we understand the argument there. What about this notice issue? With notice, the petitioner again testified that he gave notice to his supervisor about his problems on July 15th. The commission again recognizes this testimony, and again recognizes that this testimony is not rebutted by the respondent. So when looking at the evidence thus far, we have the commission saying that petitioner testified that there's some mechanism of injury that can be acceptable, and we have testimony that there was notice, and both of that is unrebutted. That's the only evidence that the commission has to look at on those two things. And then we get to the causal connection, which we've already discussed a little bit. Dr. Dvorsky in his evidence deposition opined that he was aware of his employment and the basic activities that he employed, and that during his treatment he opined on a reasonable degree of medical certainty, and I quote from his deposition, that the nature of the petitioner's work contributed to the onset and progression of neuropathies as diagnosed during his care. Dr. Vendor in his evidence deposition opined that with repetitive motions, the injury that the respondent suffered from could be caused is related. I mean, he could have suffered these injuries as a result of repetitiveness, and he didn't have the history in the medical when he reviewed the record to see that. So his opinion is very suspect, because he doesn't have all the facts like Dr. Dvorsky did. What's supposed to be the mechanism of injury in this case? He was a lineman troubleshooter for ComEd. He would climb up poles, and he would have to lift things up, and he would use his hands as hammers throughout the day, and he worked there for 30 years doing this, this job. What's this note? Where did this note come from in Dr. Analtis's records from November the 29th saying he fell off a pole? Where did that come from? Oh, I'm sorry. Where did that come from? Where did it come from? Well, the 30, I'm not sure the exact date, but it was a long time before this accident. November 29, 2000 is when the note is written. Dr. Analtis wrote that in his notes because he had treated him several years. I don't know if it was 20 years or 15 years. It was some long time before that. Dr. Analtis is an electrician who works on poles, and that quote, a while ago, he was working on an electrical wire, and he fell from a pole and injured his left ulnar nerve and also injured his neck. That's what he wrote in his records on November the 29th. Where did that come from? Who told him that? I believe, I don't know this for certain, but I think he may have been involved in that case a while ago, and I would imagine the petitioner maybe told him. I do not have any knowledge of exactly where that came from. I just know that it is in the medical records. Well, the claim in this case is for repetitive trauma that manifests itself on July the 15th, 2000. Correct. So this treatment that he received, he sought treatment from this doctor, complaining of right upper extremity numbness and tingling. And that's why he went to him. He first saw him on September 13th of 2000. This is a note from November 29th of 2000. Right. The injury that Dr. Analtis is referring to is an injury that was some time ago. It's not close in relation to time to this accident at all. I don't know if it's 15 years or 20 years. It was a long time, and I want to say it was possibly in the 80s, but I don't know that for certain. Anything in the medical records that would indicate he was talking about some injury other than the one he was treating him for? Say that again? Is there anything in the medical records that would indicate that what he's talking about here is a circumstance other than the one for which he was treating him for then? I don't know. I don't have the answer to that. All I know is that what he's referring to is an injury where he was shocked electrically and fell off a pole, and I know it's several years prior, at least 10, 15, 20. I'm not sure. I know it's nowhere close in relation in time. I believe it was when he was beginning his job with Comet, and he'd been with them for 30 years. That note in Dr. Analyst's record is a great time before this. The only reason it's in there is I believe maybe he might have treated him that time ago when he did fall, and maybe the respondent knows when that was. I don't exactly know when it was. I just know it was a while ago. But the evidence in this case that the commission has is undisputed that notice was given. It's undisputed that there was some mechanism of this injury, and the treating physician who was aware of the work to his employment. The commission focuses strictly on this, there is, it's without support in contemporaneous medical. And the last three, or the three paragraphs on the commission's page four, they really go into this. And all three of them. And the petitioner, I can't find any support in which the Workers' Compensation Act or case law states that you need to have contemporaneous medical history before any evidence can be credible. And that's what the case does. And as we go through this, you know, the commission first states that the petitioner's testimony of his work is not rebutted, but is not supported in the contemporaneous medical or any medical. Let's summarize it. Let's assume you're accurate at that point. Let's give your arguments, too. How does that overcome the hurdle that's still within the province of the commission to decide, even if you point out the flaws in the commission's analysis of Dvorsky's opinion, how does that mean the claimant carries the thing? What do you do with the contrary medical opinion? Well, first of all, the commission doesn't base their decision on Dr. Bender's opinion. Nowhere in their opinion of review do they base it on Dr. Bender's opinion. I mean, that's a statement of evidence they rely on. I think the paragraph that you're talking about, I think, you know, read in context is merely they're saying they don't believe your claimant. They don't believe him. And the reason why they don't believe him, although it's unrebutted, is that there's absolutely no medical evidence to support his testimony. And that is completely false, because there is medical evidence. And the medical evidence is contained in the evidence deposition of Dr. Dvorsky. Right. And the commission found his opinions based on speculation, because he wasn't even aware of the type of work the plaintiff had performed, and therefore couldn't credibly form opinions and clearly had no idea during the treatment of any such relationship. That's what they said. And again, that is completely false. That is completely false. Again, in the evidence deposition in which Dr. Dvorsky, the treating physician who doesn't have a, you know, he doesn't have a dog in this fight, which he testified under oath, he testified he was aware, he was aware of where he worked in his basic job activity. Counsel, your time is up. You'll have time on reply. Okay. Thank you. Counsel, you may respond. Thank you. May it please the Court. Good morning, Counsel. My name is Christopher Gibbons, and I represent the employer in this case comment. We're here to ask you to affirm the circuit court's affirmance of the Industrial or Workers' Compensation Commission's decision in this case of denying the claimant benefits. The circuit court really just addressed the issue of causal connection, and certainly there are a number of facts in the record that support the finding of no causal connection in this case. When you look at Dr. Dvorsky's opinion, which is what counsel's relying on and saying was misinterpreted on direct exam, and by the way, this claimant in 1971 had a workplace injury that was not the subject of this case. It involved his left arm, and Dr. Dvorsky in the records all indicated that the cyst in the left arm was related to a surgery he did in 2006, and in his deposition, he did not even claim that the left arm surgery of 06 was related to this case. He said he did not have an opinion on that and was choosing not to claim that that part of the treatment he rendered was related. Despite that, arbitrator Hennessey had awarded that. The commission obviously disagreed with that finding. But that's where the cyst in the left arm came from and that treatment developed out of. Insofar as the right arm and the left and right wrists, those were procedures Dr. Dvorsky did in 2000 and 2001. He gave a general opinion in the beginning of his testimony that he thought there was causal connection. Then on cross, he admitted that he didn't know what the claimant did specifically with his hands. He didn't know how long he did activities. He had no history of a workplace cause in his treating records that the claimant didn't tell him when he came to seek treatment for his problems that it was caused by work. So in essence, you're saying there were, contrary to the closing counsel's argument, legitimate reasons for the commission to discount Dvorsky's testimony. Is that in essence what you're saying? That is exactly what I'm saying. And it's well supported by the record. The evidence on his job duties, although he testified to the physical things he did on the job, he also testified to the nonphysical things he did. And he himself described his job as extremely varied in nature. I don't think he even presented a picture of a repetitive trauma-type hand activity or arm activity. Why do you believe that the commission found the claimant not to be credible? What's your understanding of why they arrived at that determination? The credibility issue, I think, went with the medical records. He testified that, well, he testified contradictorily. He didn't, going, if I, on notice, he never testified he told anyone at work about this. The testimony on notice, which is page 17 of his testimony in the transcript, he says, then I went to my GP and I says there's something wrong someplace because I can't perform my job. Who was your GP? My general practitioner, Dr. Dana Howd. That's the only testimony about him reporting an accident. We had no accident report filled out or none of the work on procedures. Well, is there some report to his supervisor that he couldn't, he kept dropping the nuts trying to? Yeah, that's page 17. I didn't read you the full quote. Okay. Question. I'm going to, question. Enter about July 15 of 2000. Did you begin noticing something about yourself? Answer, yeah. I went to my GP and I says there's something wrong someplace because I can't perform my job. I take extra washers and nuts up in the bucket. Who was your GP? My general practitioner, Dr. Dana Howd. Then she said. So there's no testimony as to talking to a supervisor? No. But the commission's decision says there was. So the commission, there's a sentence in there. Right. Saying that. I couldn't find it. I don't think there ever was any notice provided to the employer within 45 days. Specific notice of what? He's probably going to argue, perhaps, that he told the supervisor about the numbness in his hands on July 15. There's no testimony to that. The claimant never testified he told the supervisor anything at all. So you're saying that comes out of left field? Is that basically what you're saying? Yeah. I mean, no, what I'm saying is this paragraph was about the GP was mistaken as testimony to the supervisor. When it wasn't, it was the doctor. And they didn't put this doctor's records into evidence. So that's an absence in the record. But yet they put it in their decision, right? Yeah. About the supervisor. Right. The commission did have a sentence there. I saw that. And that's what they cited in support of the finding. When we go to the underlying facts, it's not there. In summary, given the weakness of Dr. Dvorsky's opinion, the lack of evidence of repetitive trauma, the indication of preexisting conditions and consistent health problems, the no report, no filing of an accident. This is a claimant who had worked for us for a long time, had been through the workers' comp process many times. We believe the decision of the commission is well supported and would ask that you affirm it. Thank you. Thank you, counsel. Counsel, in reply? Thank you. The first issue that I'd like to address is the petitioner's testimony. It's right here in the commission's statement that the commission finds the petitioner did testify of relaying to his supervisors his problems on or about July 15th. So the commission obviously heard testimony that he had given notice to him, and they found that. And they go on to say that it's not rebutted by the respondent. So notice really shouldn't even be an issue in this case. The commission found that it was given and that it wasn't rebutted by the respondent. But then they go on to say, but it's without support in this contemporaneous medical. The commission is fixated on this contemporaneous medical history, which I can't find anywhere in the workers' comp act, and I would suggest that it's not there, that you have to have in the history, medical history of the work for the notice. And with all the other reasonings that the commission, you know, tries to dispute because of the contemporaneous medical, the petitioner doesn't have the advantage point of sitting there telling the doctor, put down the list of my work activity in here. The petitioner doesn't have that ability to sit there and tell the medical doctor, send me your medical records so I can review them and make sure that the work history is in there. That burden shouldn't be a burden that's placed on the petitioner. That shouldn't be a burden of the petitioner just because it isn't in the medical. And I want to look again at, before I was, time was up, we were talking about Dr. Dvorsky, who is the treating physician in this matter. He's not somebody that's hired by the petitioner. This is the surgeon that was there from day one and treated him throughout all these conditions. And he gave an evidence deposition which he testified under oath that, and this is directly from his deposition in which he was asked, do you have an opinion to a reasonable degree of medical and surgical certainty as to whether the condition for which you have treated him are causally related to his occupation? Mr. Gibbons made an objection. And then the doctor went on to answer, I do. I do believe that the nature of the patient's work contributed to the onset and progression of neuropathies as diagnosed during his care and treatment. What more do we want the doctor to do and to say? Just because he didn't in his medical records note down petitioner's work activities are here, here, and here. He testified under oath that he knew what those were. And that's just on the previous page. He testified under oath. Now, doctor, did you and this patient ever have a discussion about his work duties or his job? An objection by Mr. Gibbons. Dr. Diworski, the patient did tell me where he was employed and the basic activities that he participates at work. Dr. Diworski was aware. The only contradicting medical opinion is from the IME. And it's hardly contradicting because in his deposition, he states, this is on page 18, my comment about the possibility of it being related would be based on the assumption that it's a forceful job on a regular, persistent basis. But I did not necessarily have the facts of that. He didn't have the facts of the petitioner's job. So I think the manifest way of the evidence shows that Dr. Diworski is aware of what he's doing. The IME doctor who's hired by the defendant isn't aware of what he's doing. And then he goes on to say, if I was provided further information that verified a possible assumption of the forceful exertions, so if I was provided more detailed information, it may or may not have demonstrated the forceful activities. And that's on page 18 of his testimony. Counsel, your five minutes is up. Okay, thank you. Thank you. Thank you, counsel, for your arguments in this matter. It will be taken under advisement.